IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

EDWARD ROMERO,

        Plaintiff

vs.                                  CIV 01-981 KBM/LCS – ACE

CURRY COUNTY DETENTION
CENTER, et al.,

        Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff Edward Romero is hearing disabled.  He brings this action against Defendant

Curry County Detention Center ("CCDC") and several individuals in their official capacities

seeking compensatory and punitive damages only.  He alleges that Defendants failed to

appropriately accommodate his disability when he was incarcerated, thereby violating Title II of

the Americans With Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.,* the Rehabilitation Act,

29 U.S.C. § 794 *et seq.,* and his civil rights under 42 U.S.C. § 1983.  *See Doc. 39; Doc. 87* at 9,

12 (specifying Title II).

Pursuant to 28 U.S.C. § 636(c) and FED. R. CIV. P. 73(b), the parties consented to have

me serve as the presiding judge and enter final judgment.  The case is set for a bench trial in

October and is presently before the court on the parties' cross-motions for summary judgment,

Defendants' motions to strike the claim for punitive damages and to exclude certain evidence, and

the motions to strike Plaintiff raises in two of his replies. *Docs. 65, 66, 68, 72, 84, 87, 105, 106.*  I

find that here are material issues of fact that preclude entry of summary judgment on the majority

of Plaintiff's theories under the ADA/Rehabilitation Act claim. Defendants are entitled to summary judgment on Plaintiff's civil rights claims as well as his claims of punitive damages and certain compensatory damages.

## I. Summary Judgment Standard

Summary judgment should be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). The Court must "view the evidence and draw any inferences in a light most favorable to the party opposing summary judgment, but that party must identify sufficient evidence" that would justify sending the case to a jury. *Williams v. Rice*, 983 F.2d 177, 179 (10th Cir. 1993) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-52 (1986)). Indeed, summary judgment

> is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed "to secure the just, speedy and inexpensive determination of every action.". . . Rule 56 must be construed with due regard not only for the rights of persons asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury, but also for the rights of persons opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

"A fact is 'material' if, under the governing law, it could have an effect on the outcome of the lawsuit. . . . A dispute over a material fact is 'genuine' if a rational jury could find in favor of the nonmoving party on the evidence presented." *Sports Unlimited, Inc. v. Lankford Enter., Inc.*, 275 F.3d 996, 999 (10th Cir. 2002) (citing *Anderson,* 477 U.S. at 248).

## II. Defendants' Motions *In Limine* & Plaintiff's Motions To Strike

Since summary judgment is "appropriate only if the *admissible* evidence" meets the requisite showing, I first address the parties' motions in limine and motions to strike. *Sports,* 275 F.3d at 999 (emphasis added). Defendants seek to exclude two types of evidence – the legal conclusions of Plaintiff's expert and United States Department of Justice ("DOJ") articles and settlement agreements. In numerous footnotes to his replies, Plaintiff seeks to strike portions of two affidavits and "nonresponsive" responses to his undisputed material facts.

### A. *Plaintiff's Expert Cannot Testify To Legal Conclusions*

Among other things, Plaintiff's expert, Dr. Nancy Eldredge, has given her opinion about what is required for prison officials to meet ADA and federal constitutional standards for deaf inmates. Defendants seek to exclude her conclusions about what the law requires of them. *See Doc. 69* & Exhs. A-B; *Doc. 93* at 1. Defendants are confident that they and Plaintiff's counsel "work out an appropriate admonishment . . . regarding the appropriate scope of Dr. Eldredge's testimony. *Doc. 93* at 2.

Plaintiff counters that Dr. Eldredge is not rendering a legal opinion and instead sets forth her expert opinion about what types of auxiliary aids and services were reasonable and necessary under the circumstances. *Doc. 82* at 6-7. Both Plaintiff's counsel and Dr. Eldredge, however, do not always differentiate their assertions about what accommodations are reasonable from their conclusions about what the ADA and Rehabilitation Act require. *See id.* at 8; *Doc. 69,* Exh. B at 12-13. In addition, Plaintiff tenders an affidavit from Dr. Eldredge that indicates she has been qualified as an expert in other cases where she has testified about what is "reasonable accommodation under the law." *See Doc. 101* (affidavit at ¶ 2).

Generally, legal conclusions by experts are inadmissible. Nevertheless, the Tenth Circuit has held that while it is reversible error for an attorney expert

> to offer an "array of legal conclusions touching upon nearly every element of the plaintiff's burden of proof.". . . "[W]hen the purpose of testimony is to direct the jury's understanding of the legal standards upon which their verdict must be based, the testimony cannot be allowed. In no instance can a witness be permitted to define the law of the case." . . . *However, we emphasized that the line we were drawing was narrow, recognizing that "a witness may refer to the law in expressing an opinion without that reference rendering the testimony inadmissible."* . . . "[A]n expert's testimony is proper under Rule 702 if the expert does not attempt to define the legal parameters within which the jury must exercise its fact-finding function."

*Zuchel v. City and County of Denver, Colo.,* 997 F.2d 730, 742 (10th Cir. 1993) (citations omitted; emphasis added).[1]

The problem with expert legal conclusions is heightened when a jury hears the case. However, this matter is set for a bench trial. *See Docs. 32, 33, 39.* I recognize that Dr. Eldredge's legal conclusions are not binding on this court, and assure counsel that I am capable of segregating her appropriate expert testimony from any inadmissible legal conclusions. Thus, the motion is granted in part and denied in part. Dr. Eldredge may testify to what she believes constitute reasonable accommodations but not to legal conclusions.

### B. DOJ Articles & Settlement Agreements Are Inadmissible

Defendants also seek to exclude DOJ articles and settlement agreements with law

---

[1] *See also Wicks v. Riley County Bd. of County Comm'rs,* 125 F. Supp.2d 1282 (D. Kan. 2000) (court excludes affidavit of expert in ADA case submitted to show Plaintiff is disabled, in part because affidavit was conclusory and in part "because it represents an inadmissible legal conclusion. . . . "[A]n expert may offer his opinion as to facts that, if found, would support a conclusion that the legal standard at issue was satisfied, but he may not testify as to whether the legal standard has been satisfied.")

enforcement-related entities other than CCDC. The articles and settlements include discussion about the availability and use of Telecommunications Devices for the Deaf ("TDD's"). Plaintiff's counsel has indicated that she intends to ask the court take judicial notice of these documents. *See Doc. 67,* Exh. B.

Defendants move to exclude the documents as irrelevant, prejudicial, unauthenticated, and not the subject for judicial notice. *See Docs. 66, 67.* I agree that settlement agreements are inadmissible under Federal Rule of Evidence 408 to show liability. *See e.g., Doe v. Aramark Educational Resources, Inc.,* 206 F.R.D. 459, 461-62 (M.D. Tenn. 2002). To the extent that the articles are probative of anything, the articles stand in no different position than Dr. Eldridge's legal conclusions discussed above.

Moreover, Plaintiff's counsel does not respond to Defendants' relevance and prejudice arguments. Instead, she submits nine pages of numbered assertions that she characterizes as "adjudicative" and "legislative" facts and asks that the court to take judicial notice of them. Contrary to counsel's characterization, the numerous "facts" are actually various legal conclusions supporting Plaintiff's theory of the case.

> Judicial notice "is a process by which a court takes recognition of a *fact* in the absence of formal proof.". . . It is clearly not appropriate for the Court to use the doctrine of judicial notice to make conclusions of law in the present case based on the conclusions of law made in [another case]. Federal Rule of Evidence 201 explicitly restricts the doctrine of judicial notice to findings of fact.

*Weinstein v. Islamic Republic of Iran,* 175 F. Supp.2d 13, 16-17 (D.D.C. 2001) (emphasis added; citations omitted). Accordingly, the motion to exclude the articles and settlement agreements will be granted.

5

### C. Burdine and Swearingen Affidavits Will Not Be Struck

Both of Defendants' responses to Plaintiff's motions for summary judgment contain affidavits from Don Burdine, the administrator of CCDC from May 1995 to October 1998, and Tom Swearingen, the administrator of CCDC from October 1998 to the present. *See Doc. 86, Exh. F* and *Doc. 89,* Exh. E (hereinafter collectively referred to as "*Burdine Aff.*"); *Doc. 86,* Exh. G and *Doc. 80,* Exh. F (hereinafter collectively referred to as "*Swearingen Aff.*"). Both affidavits provide testimony about Plaintiff's placement in isolation and his requests for, and access to, auxiliary aids.

With regard to placement in isolation, Burdine states he reviewed Plaintiff's inmate file and that Plaintiff's placement in "isolation" was protective custody to ensure his personal safety and not for punitive reasons. Burdine concludes that, the best of his knowledge, Plaintiff "was never disciplined or punished for misbehavior or for violation of inmate rules or for any other reason." *Burdine Aff.,* ¶ 2.

Swearingen acknowledges that he was not administrator during Plaintiff's first two incarcerations. However, his affidavit indicates that he also "review[ed] Plaintiff's inmate file" and that Plaintiff was placed in isolation as a matter of protective custody rather than punishment. *Swearingen Aff.,* ¶ 4 & 5. Swearingen recalls the occasion when it was necessary for him to review the report of an altercation between Plaintiff and a corrections officer, but he determined Plaintiff "would not be charged or disciplined." *Id.,* ¶ 2.

With regard to alleged requests for accommodations, Burdine states that he recalled only one request for a TDD device for Plaintiff's use and does not recall Plaintiff ever asking for an interpreter. Burdine explains the steps he took to locate and borrow a TDD and concludes that

"[o]nce the TDD was obtained it was made available for Plaintiff's use upon request." *Burdine Aff.,* ¶ 4. Burdine also states that "for safety reasons, Plaintiff was not allowed unrestricted access to the booking area and the TDD, and that Plaintiff was allowed to use the device so long as there was an officer available to escort Plaintiff." *Id.,* ¶ 5.

Swearingen states that: Plaintiff did not request a TDD; he understood that Plaintiff was using a donated TDD during his March 1999 incarceration; for safety reasons and to avoid vandalism, the TDD was kept in the booking area; and, to the best of his "recollection," Plaintiff could use the TDD upon request when "adequate staff" were available to escort him to the booking area. *Swearington Aff.* at ¶¶ 6 & 7.

Plaintiff contends that Swearingen cannot attest to events during Plaintiff's first two incarcerations and Burdine cannot attest to events during Plaintiff's third incarceration because such testimony would not be based on personal knowledge. Likewise, he argues that their testimony concerning the circumstances under which Plaintiff was permitted to use the available TDD is not based on personal knowledge. *Doc. 106,* nn.8-9, 15-16. Finally, he moves to strike the portion of Swearingen's affidavit that reflects the contents of the report about the altercation with Plaintiff, as not based on personal knowledge and as hearsay. *Doc. 105,* n.7. I find these arguments without merit.

Both men were administrators of the prison and both reviewed Plaintiff's file in preparing their affidavits:

> That Rule 56(e)'s requirements of personal knowledge and competence to testify have been met may be inferred from the affidavits themselves. . . . [Affiant's] personal knowledge and competence to testify are reasonably inferred from their positions and the nature of their participation in the matters to which they swore.

*Barthelemy v. Air Lines Pilots Ass'n,* 897 F.2d 999, 1018 (9th Cir. 1990).

As administrators, both men would know the policies and reasons why CCDC inmates are placed in protective custody. Having reviewed Plaintiff's file, they can eliminate the possibility that protective custody was for some disciplinary reason. Likewise, they can testify to the policy reasons underlying the circumstances under which Plaintiff would be permitted an available TDD. At the very least, they can testify to the absence of a request for a TDD and the circumstances under which he used an available TDD as reflected in his file.

Furthermore, Plaintiff seeks much too broad relief because he moves to strike all portions of the paragraphs of their affidavits. Even assuming Burdine's testimony should be confined to the first two incarcerations and Swearingen's to the third incarceration, there is no reason to strike the paragraphs. Rather, the appropriate remedy would be to segregate their respective testimony to the respective incarcerations. Since the testimony is the same for all of the incarcerations, segregating the testimony has no practical effect on the legal analysis.

Finally, the prison incident report may be admissible under a number of exceptions to the hearsay rule, regardless of whether the officer is available. *See* FED. R. EVID. 803(1), (6), (8) (present sense impression, business record, and perhaps public record). As the administrator who reviewed the report, Swearingen is competent to authenticate the document.

### D. Defendants Properly Responded To Plaintiff's Alleged Undisputed Material Facts

In his "undisputed material facts" sections, Plaintiff sets forth his theory of the case by reciting a narrow version of facts and law. In response, Defendants' often do not dispute the narrow assertion, and then also set forth their own version of which facts are material for their theory of the case. Defendants also object to conclusions of law that are asserted as facts.

The bulk of Plaintiff's motions to strike constitute arguments that "Defendants extensively utilize [an] improper, 'non-responsive' method in an attempt to avoid and evade admitting Plaintiff's UMFs". *Doc. 106,* n.6; *see also id.,* nn., 6-7, 10-14, 17-19, 21, 23-24; *Doc. 105,* nn. 8-11, 13, 15, 18.  In other words, Plaintiff seeks to strike as "improper," anything that responds beyond his narrow assertion of what is material and how the law should be applied.  Not surprisingly, the various responses Plaintiff seeks to strike go to the very heart of the legal dispute I take up below.  Plaintiff cites no authority for his position, and I find his position hyper-technical as well as meritless, particularly since conclusions of law are not fact and this district's local rule invites Defendants to respond in the format they did here.  D.N.M.LR-Civ. 56.1(b).  Therefore, I deny Plaintiff's motions to strike.

## III.  ADA/Rehabilitation Act Claims

### A. Title II of ADA And Rehabilitation Act Apply To Prisons

The Rehabilitation Act provides:

> No otherwise qualified individual with a disability in the United
> States, as defined in section 705(20) of this title, shall, solely by
> reason of her or his disability, be excluded from the participation in,
> be denied the benefits of, or be subjected to discrimination under
> any program or activity receiving Federal financial assistance.

29 U.S.C. § 794(a).  The Rehabilitation Act applies to, among other things, departments, agencies, or instrumentalities of a local government.  *See* 29 U.S.C. § 794(b)(1).  Title II of the ADA likewise prohibits "public entities" either from excluding "qualified individuals" with disabilities "from participation in or . . . the benefits of the services, programs, or activities of a public entity" or from "discrimination by any such entity" "by reason of" their disabilities.  42 U.S.C. § 12132.  "Public entity" is defined the same as under the Rehabilitation Act.  *See* 42

U.S.C. § 12131(1).

Title II of the ADA is enforceable through the same remedies as provided by the Rehabilitation Act. 42 U.S.C. § 12133. Thus, with the exception of the federal funding requirement of the Rehabilitation Act, for the purposes of this suit the elements of Plaintiff's claim under Title II of the ADA and the Rehabilitation Act are identical.[2]

A unanimous Supreme Court has held that the plain language of Title II encompasses prisons. *Pennsylvania Dept. of Corrections v. Yeskey*, 524 U.S. 206 (1998). "State prisons fall squarely within the statutory definition of 'public entity,' which includes 'any department, agency, special purpose district, or other instrumentality of a State or States or local government.'" *Id.* at 210. The Supreme Court has not yet addressed whether the Rehabilitation Act also applies to prisons. However, because public entity is defined the same in both statutes and because the analysis is virtually identical for either basis of recovery, I will assume as have other courts, that the Rehabilitation Act also applies in the prison context.[3]

### B. Elements of ADA/Rehabilitation Act Claim

To succeed, Plaintiff must prove that:

    (1) he is a "qualified individual with a disability;"

***and***

    (2) he was ***either***:
        (a) excluded from participation in or denied the benefits of some

---

[2] *See Parker v. Universidad de Puerto Rico,* 225 F.3d 1, at * 4 & n.2 (1st Cir. 2000); *Randolph v. Rodgers,* 170 F.3d 850, 868 (8th Cir. 1999); *Bonner v. Lewis,* 857 F.2d 559, 562-63 (9th Cir. 1988) (Rehabilitation Act); *Spurlock v. Simmons,* 88 F. Supp.2d 1189, 1195 (D. Kan. 2000); *Hanson v. Sangamon County Sheriff's Dept.,* 991 F. Supp. 1059, 1062 & n.2 (C.D. Ill. 1998); *c.f., Thompson v. Colorado,* 278 F.3d 1020, 1029 (10th Cir. 2001), *cert. denied,* 122 S. Ct. 1960 (2002).

[3] *E.g., Spurlock,* 88 F. Supp. 2d at 1195; *Hanson,* 991 F. Supp. at 1062 (ADA and Rehabilitation Act apply to prisoners and county jails).

> public entity's services, programs, or activities, ***or***
> (b) was otherwise discriminated against by the public entity;
> ***and***
> (3) the exclusion, denial of benefits, or discrimination was by reason
> of his disability.

*Gohier v. Engright,* 186 F.3d 1216, 1219 (10th Cir. 1999). Defendants do not dispute that

Plaintiff meets the first prong. *See Doc. Doc. 89* at 4, ¶ 1; *id.* at 14.

Plaintiff further contends that because he was not provided a TDD or an interpreter versed

in American Sign Language, he was denied "full" and "equal" access to nine prison "services"[4]

and thus is entitled to summary judgment. Although Defendants do not argue that the nine areas

cannot constitute a prison program/service/activity,[5] there is substantial disagreement about the

---

[4] As I understand it, the first eight services pertain to the lack of an interpreter. That is, Plaintiff asserts that CCDC was obliged to made an interpreter available during the (1) booking and (2) classification processes each time he was jailed, to ensure that he understood and participated in booking and classification, as well as the medical and psychological intake evaluation. He also claims that a sign language interpreter was required during (3) orientation to translate the CCDC Inmate Handbook to ensure that he understood and could discuss its contents. Had the interpreter been provided, he asserts that he then would have had information concerning the following "services": (4) the inmate grievance procedures; (5) the inmate commissary; (6) use of special request forms; (7) visitation; and (8); receiving and releasing property. The final service/benefit asserted is access to (9) the inmate telephone system. Plaintiff claims CCDC's failure to have a TDD available, and to allow him to use it on the same terms that hearing inmates used telephones denied him full and equal benefit of this service.

[5] Few cases discuss what constitutes a program/service/activity. In *Yesky,* the Supreme Court identified some of the "programs" prisons offer as recreational activities, medical services, educational and vocational programs such as the motivational boot camp program at issue there. 524 U.S. at 210. Similarly, in *Bonner,* the Ninth Circuit specifically mentioned "disciplinary proceedings, Honor Dorm Review Committee hearings, counseling, rehabilitation, medical services" as among program services encompassed by the Rehabilitation Act. 857 F.2d at 563. The Eighth Circuit in *Randolph* assumed without discussion that programs/services/activities applies to disciplinary proceedings. 170 F.3d at 858.

A Third Circuit decision assumed that "intake" qualifies. *Chisolm,* 275 F.2d at 329 At least three district courts hold that prison telephones qualify. *Spurlock,* 88 F. Supp. 2d. at 1195 (citing *Niece v. Fitzner,* 992 F. Supp. 1209, 1218-19 (E.D. Mich. 1996); *Hanson,* 991 F. Supp. 1059, 1062 & n.2 (C.D. Ill. 1998). Plaintiff's complaints are similar to those of the prisoners in *Chisolm* and *Spurlock.*

In an unpublished decision the Tenth Circuit declined to say whether it agreed with the position of the Eighth Circuit in *Gorman v. Bartch,* 152 F.3d 907, 913 (8th Cir. 1998). The *Gorman* decision concluded that the ADA and Rehabilitation Act "applied to a wheelchair-bound arrestee injured in an ill-equipped police van . . . by first holding that '[a]rrestee transportation is a program or service' within the

remaining requirements of second and third prongs.

### C. DOJ Regulations and *Turner v. Safely*-Like Concerns Are Applicable In Determining Whether Plaintiff Was Denied Meaningful Access To Benefits/Services

Section 12134(a) of Title 42 directs the DOJ to develop regulations to implement Title II, and, therefore, the regulations are entitled to "substantial deference" and have "the force of law." *See Marcus v. Kansas Dept. of Revenue,* 170 F.3d 1305, 1306 & n.1 (10th Cir. 1999).  Subpart E of the regulations address "communications" and provides in part:

> **§ 351.60  General.**
> (a)  A public entity shall take appropriate steps to ensure that communications with . . . participants . . . with disabilities are as effective as communications with others.
> (b)(1)  A public entity shall furnish appropriate auxiliary aids and services where necessary to afford an individual with a disability an equal opportunity to participate in, and enjoy the benefits of, a service program, or activity conducted by a public entity.
> (2)  In determining what type of auxiliary aid and service is necessary, a public entity shall give primary consideration to the requests of the individual with disabilities.

28 C.F.R. § 35.160.  The "preamble" to this regulation provides that the "expressed choice [of the person with the disability] shall be given primary consideration by the public entity." *Id.* at App. A, Section 35.160  However, the disabled person's request is not necessarily conclusive:

> The public entity shall honor the choice unless it can demonstrate that another effective means of communication exists or that the use of the means chosen would not be required under § 35.164.
> Deference to the request of the individual with a disability is desirable because of the range of disabilities, the variety of auxiliary aids and services, and different circumstances requiring effective communication. . . .  Although in some circumstances a notepad and written materials may be sufficient to permit effective communication, in other circumstances they may not be sufficient.

---

meaning of the disability statutes." *Moore v. Prison Health Servs., Inc.,* 1999 WL 1079848 at *1 (10th Cir. 1999).  *Moore* held that the plaintiff failed to identify "any comparable program or service from which he was barred at the prison." *Id.*

> For example, a qualified interpreter may be necessary when the information being communicated is complex, or is exchanged for a lengthy period of time. Generally, factors to be considered in determining whether an interpreter is required include the context in which the communication is taking place, the number of people involved, and the importance of the communication.

*Id.*

Plaintiff argues as though the ADA and Rehabilitation Act impose strict liability for failure to provide interpreters and TDDs to hearing impaired inmates. I have found no decision that supports such a broad reading of the acts. To the contrary, in determining whether prison officials acted in contravention of the ADA and Rehabilitation Act, the few courts that have entertained such suits hold that the test is whether the handicapped individual has "meaningful" or "reasonable" access to the prison services. They further hold that these actions typically involve questions of fact.[6] For example, in what appears to be one of the first cases, the Ninth Circuit explained that:

> whether the prison official's refusal to provide qualified interpreter services impermissibly discriminated against [Plaintiff] raises other genuine issues of material fact. Is [Plaintiff] able to communicate effectively without the use of a qualified interpreter? ***Prison officials claim adequate communication is achieved through use of the telecommunication device and inmate interpreters. If this is so, no discrimination could have occurred.*** [Plaintiff], however claims communication through either the telecommunication device or prison inmate interpreters is extremely difficult and inadequate.

---

[6] None of the decisions Plaintiff cites in his reply are conclusive of liability in his favor because they do not involve communications or the "services" Plaintiff claims he was denied. All of these cases hold that issues of fact as to the reasonableness of the prison's response precluded summary judgment. *See Randolph,* 170 F.3d at 858 (disciplinary hearing; summary judgment denied due to issues of fact); *Schmidt v. Odell,* 64 F. Supp. 23 1014 (D. Kan. 1999) (double amputee, issues of fact on reasonableness of accommodations provided precluded summary judgment); *Cooper v. Weltner,* 1999 WL 1000503 (D. Kan. 1999) (opinion not clear, but inmate's condition necessitated accommodations to shower properly; summary judgment denied because of issues of fact whether accommodations provided were reasonable). *See also Chisolm,* 275 F.3d at 327-30; *Duffy v. Riveland,* 98 F.3d 447, 454-55 (9th Cir. 1996); *Spurlock,* 88 F. Supp. 2d at 1195; *Lee v. New York, Dep. of Correctional Servs.,* 1999 WL 673339 at *14 (S.D.N.Y. 1999).

*Bonner,* 857 F.2d at 563 (emphasis added).

Another crucial fact is whether the inmate made a request for auxiliary aids. *See Spurlock,* 88 F. Supp.2d at 1195. The Eighth Circuit has noted that "public entities are not required to guess at what accommodations why should provide." *Randolph,* 170 F.3d at 858. Indeed, determining precisely what the inmate has requested is consistent with the regulations that recognize there is a wide range of capabilities among the handicapped and, therefore, their requests should be honored if possible.

Moreover, in general prison civil rights litigation, prison policies that are challenged as unconstitutional are entitled to deference under the principles announced in *Turner v. Safley,* 482 U.S. 78, 84 (1987).[7] Indeed, the interest in protecting prison security is legitimate "beyond question." *Thornburgh v. Abbott,* 490 U.S. 401, 415 (1989).

> On one hand, infringements on prisoners' constitutional rights must not be "arbitrary or irrational," nor an "exaggerated response" to security needs. . . . On the other hand, courts have been extremely deferential to the decisions made by prison administrators, recognizing that "[r]unning a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government. Prison administration is, moreover, a task that has been committed to the responsibility of those branches, and separation of powers concerns counsel a policy of judicial restraint."

---

[7] The *Turner* inquiry asks:

> (1) whether there is a rational connection between the prison policy and a legitimate governmental interest; (2) whether there are alternative means for inmates to exercise their constitutional rights; (3) the effect that accommodating the exercise of the disputed rights would have on guards, other inmates, and prison resources; and (4) whether there are ready, easy-to-implement alternatives that would accommodate the inmates' rights.

*Ind v. Wright,* 2002 WL 1859038 (10th Cir. 8/14/02) (unpublished); *see also Turner,* 482 U.S. at 90.

*Farmer v. Perrill,* 288 F.3d 1254, 1261 (10th Cir. 2002) (citation omitted).  Moreover, "'[w]here a state penal system is involved, federal courts have . . . additional reason to accord deference to the appropriate prison authorities.'"  *Peterson v. Shanks,* 149 F.3d 1140, 1144 (10th Cir. 1998) (citation omitted).

The Tenth Circuit has not addressed whether the *Turner* test applies to the ADA or Rehabilitation Act in particular or to statutory rights in general.  The other circuits are presently split or have declined to address the issue.  Nevertheless, the courts are in accord that safety and security issues are among the legitimate contextual factors to consider in determining inmate claims under the ADA/Rehabilitation Act.[8]  This approach is consistent with the above regulations

---

[8]  The Ninth Circuit held that *Turner* applies to prisoner ADA claims, finding the statute

> was not designed to deal specifically with the prison environment; it was intended for general societal application. There is no indication that Congress intended the Act to apply to prison facilities irrespective of the considerations of the reasonable requirements of effective prison administration.  It is highly doubtful that Congress intended a more stringent application of the prisoners' statutory rights created by the Act than it would the prisoners' constitutional rights.

*Gates v. Rowland,* 39 F.3d 1439, 1447 (9th Cir. 1994).  It continues to apply *Turner* to prisoner ADA/Rehabilitation Act claims.  *See Cerny v. Bail,* 24 Fed.Appx. 833, 2002 WL 5669 (9th Cir. 2002).

In 1996, the Third Circuit held Turner applies, but did but subsequently withdrew the opinion.  *Inmates of Allegheny County Jail v. Wecht,* 93 F.3d 1124, 1136 (3rd Cir. 1996).  Since that time, it has declined to decide the issue.  *See Chisolm,* 275 F.3d at 327; *Yeskey v. Pennsylvania Dept. of Corrections,* 118 F.3d 168, 174-75 & n. 8 (3rd Cir. 1997), *aff'd on other grounds,* 524 U.S. 206 (1998).  Nevertheless, *Chisolm* indicates that in evaluating whether the auxiliary aids provided by the prison were "effective" safety and security concerns are part of the equation.  *Chisolm,* 275 F.3d at 329.  The Seventh Circuit's decision in *Love v. Westville Correctional Center,* 103 F.3d 558 (7th Cir. 1996) and the Eighth Circuit's decision in *Randolph,* 170 F.3d at 859, are in accord.

The Eleventh Circuit holds that *Turner* does not "by its terms, apply to statutory rights."  *Onishea v. Hopper,* 171 F.3d 1289, 1300 (11th Cir. 1999), *cert. denied,* 528 U.S. 1114 (2000).  It went on to say

> [t]hat does not mean, however, that the district court's use of the *Turner*

and caselaw.

I do not agree with Plaintiff that consideration of prison safety and security factors is the same thing as entertaining an "undue burden" affirmative defense. *See Doc. 106* at 2. They are simply factors that are unique and ubiquitous to the prison setting. Accordingly, I will adopt the approach that factors prison safety and security into the analysis of Plaintiff's claims under the ADA and Rehabilitation Act.

### D. Plaintiff's "Policy & Modification" Claims Cannot Support Damages

Similar to a provision in the earlier Rehabilitation Act, 28 C.F.R. § 35.105(a) of the ADA required public entities to have evaluated their services in light of the ADA and to make any "necessary modifications" by the early 1990's. Plaintiff argues that in light of these regulations, "Defendants should have made appropriate modification to their policies and procedures years before the commencement of [his] June 1998 Incarceration." *Doc. 88* at 23; *see also id.* at 12-13; *Doc. 83,* at 13-14.

Plaintiff apparently contends that CCDC violated these regulations by not formulating a written policy about inmate use of TDDs and by not having such a device available before he arrived at the facility. *See Doc. 88* at 20 (allegation that CCDC "did not make a TDD available" to Plaintiff "throughout the duration" of his incarcerations); *id.* at 21 (contention that as with hearing inmates, Plaintiff entitled to have TDD available to him "every day of the week"); *id.* at

_____

> factors requires vacating its judgment. . . . The district court was entitled to find on this record--it indeed seems obvious--that the requirements for participation in prison programs are determined in part by the same "legitimate penological interests" that *Turner* respects in the First Amendment context. Security is one such legitimate interest. *Turner* and its antecedents indeed so recognize.

*Id.*

22 (Plaintiff entitled to have "unfettered access to a TDD"), *Doc. 83* at 13 (CCDC policies and inmate handbook "are completely silent as to reasonable accommodations for Deaf inmates"); *Doc. 106* at 20 ("Mr. Romero's request for access to a TDD is not a pre-requisite or a 'trigger' for Defendants' duty to provide a TDD.").

Yet, this is an action for damages. At least one decision holds that while there is a private right of action to enforce the timely adoption of a plan and modification regulation and such evidence is admissible for the discrimination claim, damages are not recoverable simply for failure to implement plans pursuant to the regulation. *Matthews v. Jefferson,* 29 F. Supp. 2d 525, 540 (W.D. Ark. 1998) (citing *Miller v. City of Johnson,* 1996 WL 406679 (E.D. Tenn. 1996), which in turn cites *Tyler v. City of Manhattan,* 849 F. Supp. 1442 (Kan. 1994)); *see also Tyler v. City of Manhattan,* 857 F. Supp. 800, 819 (D. Kan, 1994). Thus, it would appear that damages cannot be premised on this claim.

### E. *Material Facts Preclude Summary Judgment In Favor Of Plaintiff On His Claims That CCDC Failed To Provide Him An Interpreter Or TDD After His Repeated Requests*

The record is replete with genuine issues of material facts concerning if and when Plaintiff requested auxiliary aids, how effectively he could communicate without an interpreter or TDD, and when the prison secured a TDD.[9] Accordingly, I deny the parties' cross-motions for summary judgment on Plaintiff's ADA and Rehabilitation Act claims. *Doc. 87, see also Docs. 65,*

---

[9] For instance, Plaintiff contends that he repeatedly requested an interpreter and TDD on each occasion when he was incarcerated. Defendants contends that never asked for an interpreter and was given a TDD when he requested one. Plaintiff counters that Defendants destroyed the notes he wrote asking for an interpreter and TDD. Plaintiff claims he could not communicate effectively with the written English language. Defendants claim that he can and did, and point out that one of Plaintiff's notes indicates that he could use a regular telephone with his hearing aid. Resolution of these issues, in part, will require credibility findings.

*71* (ADA/Rehabilitation Act portion).[10]

## IV. Civil Rights Claims

The parties cross-move for summary judgment on Plaintiff's § 1983 claims. *See Doc. 84; Doc. 71* at 14-19. Plaintiff's theories of recovery are not clear from his Amended Complaint. Therefore, I rely on his briefs to clarify the basis for his § 1983 claims and find that they fall into three categories: "punishment," access to counsel by telephone, and violation of CCDC's own operating procedures.

*Punishment:* Plaintiff claims that Defendants "punished" him in the following ways:

> (1) by not having a TDD available all the time for his use, Defendants effectively "revoked" the telephone privileges that hearing inmates have even though he committed no "infractions," *see Doc. 84,* at 4-5, 13-14;
>
> (2) by not providing an interpreter during booking and orientation, and ensuring that Plaintiff understood all of the rules and regulations contained in the inmate handbook, Defendants "governed" Plaintiff by "secret rules" and deprived him of his "liberty" interest in how to properly use he speaker intercom in his cell; *see id.* at 14-15; and
>
> (3) by placing him in an isolation cell without explanation, even though his offense did not warrant classification to an isolation cell and he committed no infractions; *see id.* at 16-17.

*Access To Counsel By Telephone:* By not having a TDD available when he was brought in for booking, Defendants allegedly denied him of his "constitutional right to make three phone calls during the booking process." *Id.* at 17. In a related argument he asserts that "[e]ach and every time CCDC refused to provide Mr. Romero with a TDD to call his attorney, CCDC was

---

[10] I note that Plaintiff has not established the CCDC receives federal funding for the purposes of Rehabilitation Act liability. Because summary judgment was not sought on this ground, however, I will address that element of Plaintiff's claim at trial.

revoking Mr. Romero's constitutional right to consult with this lawyer." *Id.* at 17-18. However, the "lawyer" he is concerned with here is the divorce attorney he had consulted with prior to incarceration. *See id.* at 18; *see also Plf. Depo.* at 139-40; *Transcripts of TDD Calls* (8/1/98 & 8/25/98).

**CCDC's Operating Procedures:** Plaintiff maintains that CCDC's procedures require that it "answer prisoner questions" and "inform [him] as to the schedules concerning incarceration" but that CCDC failed to explain why he was reincarcerated the second time. *Doc. 84* at 18-19. He also claims that CCDC's procedures prohibit nondiscrimination and require identification of inmates with special needs, but are "absolutely silent as to accommodations, auxiliary aids, services, interpreters, TDDs, and other devices [such that] Defendants failed to provide Mr. Romero with any arrangements for his special needs." *Id.* at 20; *see also id.* at 3-4.

Since this is a suit against the county and individuals in their official capacities, liability cannot be predicated on *respondeat superior.* To establish liability, Plaintiff must show that a constitutional violation occurred and that a county policy was the moving force behind the violation. *E.g., City of Canton v. Harris,* 489 U.S. 378, 385 (1989); *Myers v. Oklahoma County Bd. of County Comm'rs,* 151 F.3d 1313, 1320 (10th Cir. 1998). For a number of independent reasons, Defendants are entitled to summary judgment on all of Plaintiff's § 1983 claims.

### A. Failure To Allege Cognizable Constitutional Violations

Plaintiff blatantly asserts that he has a constitutional right to make three telephone calls during booking. The only authority Plaintiff cites as the origin of this "right" is the deposition of a booking officer who testified that CCDC's booking procedure allows for the telephone calls. *See Doc. 84* at 17. The "right" conferred by this procedure is to make *personal* telephone calls and

there is no "constitutional right to make personal telephone calls." *Arney v. Simmons,* 26 F. Supp. 2d 1288, 1298 (D. Kan. 1998) (quote from attached unpublished Tenth Circuit opinion). Plaintiff's assertions that Defendants violated CCDC operating procedures do not state cognizable constitutional claims. *E.g., Gaines v. Stenseng,* 292 F.3d 1222, 1225 (10th Cir. 2002) ("To the extent Gaines seeks relief for alleged violations of state statutes and prison regulations, however, he has stated no cognizable claim under § 1983."). Finally, the lawyer Plaintiff says he could not call was his civil divorce attorney, so the Sixth Amendment is not implicated.

Plaintiff correctly notes that due process governs pretrial detainees under *Bell v. Wolfish,* 441 U.S. 520 (1979). He is incorrect, however, when he suggests that *Bell* due process requires something different than the Eighth Amendment simply because of an inmate's status as that of a pretrial detainee. *See Doc. 105* at 19-20. It is well-settled that the inquiry is identical regardless of whether the inmate is held under a conviction or pretrial detention. *E.g., Lopez v. LeMaster,* 172 F.3d 756, 759 n. 2 (10th Cir.1999).

Plaintiff sets forth a related argument that his status as a pretrial detainee renders the *Turner* inquiry discussed above inapplicable. Yet *Turner,* like *Bell* and a number of other earlier Supreme Court cases, recognized that there are legitimate reasons for restrictions on pretrial detainees or other inmates that do not amount to a violation of the federal constitution.[11]

---

[11] In *Bell,* the Supreme Court stated

> The factors identified in *Mendoza-Martinez* provide useful guideposts in determining whether particular restrictions and conditions accompanying pretrial detention amount to punishment in the constitutional sense of that word. A court must decide whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose. . . . Absent a showing of an expressed intent to punish on the part of detention facility officials, that determination generally will turn on "whether an alternative purpose to

Paramount in this regard is safety and security of inmates and correctional officials.[12]   Indeed,

*Turner* incorporates and reiterates the *Bell* rationale.[13]

Finally, Plaintiff is mistaken that the procedural due process requirements for disciplinary

hearings under *Wolff v. McDonnell,* 418 U.S. 539 (1974) are somehow implicated in this case and

provide him "more due process" prior to placement in protective custody.  *Doc. 105* at 20.  There

is no question Plaintiff was never subjected to a disciplinary hearing.  On the other hand, under

the Eighth Amendment "prison officials must 'tak[e] reasonable measures to guarantee the

inmates' safety.'"  *Jordan v. Doe,* 15 Fed.Appx. 564, 566, 2001 WL 127752 (10th Cir. 2001)

---

> which [the restriction] may rationally be connected is assignable for it,
> and whether it appears excessive in relation to the alternative purpose
> assigned [to it]." . . .   Thus, if a particular condition or restriction of
> pretrial detention is reasonably related to a legitimate governmental
> objective, it does not, without more, amount to "punishment.". . .   Courts
> must be mindful that these inquiries spring from constitutional
> requirements and that judicial answers to them must reflect that fact rather
> than a court's idea of how best to operate a detention facility. . . .

441 U.S. at 538 (citations omitted).

[12] *Bell* further provides that:

> maintaining institutional security and preserving internal order and
> discipline are essential goals that may require limitation or retraction of
> the retained constitutional rights of both convicted prisoners and pretrial
> detainees.   "[C]entral to all other corrections goals is the institutional
> consideration of internal security within the corrections facilities
> themselves.". . .   Prison officials must be free to take appropriate action
> to ensure the safety of inmates and corrections personnel and to prevent
> escape or unauthorized entry.

441 U.S. at 547 (citations omitted).

[13] "If *Pell, Jones,* and *Bell* have not already resolved the question posed in *Martinez,* we resolve it
now:  when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is
reasonably related to legitimate penological interests. In our view, such a standard is necessary if "prison
administrators . . ., and not the courts, [are] to make the difficult judgments concerning institutional
operations." 482 U.S. at 89.

(citations omitted). In a recent unreported decision, the Eighth Circuit held summary judgment was properly entered in favor of defendants where a pretrial detainee claimed his placement in segregation prior to a disciplinary hearing violated § 1983. The Court held:

> His Fourteenth Amendment claims failed because his proof did not create a genuine issue of material fact that defendants confined him to administrative segregation prior to any hearing for punitive reasons rather than for institutional security. *See Bell v. Wolfish,* 441 U.S. 520, 538-40 (1979) (maintaining safety and internal order within institution are permissible nonpunitive objectives); *Martinez v. Turner,* 977 F.2d 421, 423 (8th Cir.1992) (pretrial detainees may not be punished, and whether particular restriction or condition accompanying pretrial detention is punishment turns on whether restriction or condition is reasonably related to legitimate governmental objective), *cert. denied,* 507 U.S. 1009 (1993).

*Whitfield v. Dicker,* ___ Fed.Appx. ___, 2002 WL 362920 at *1 (8th Cir. 2002).[14]

The same result is warranted here. The undisputed evidence establishes that Plaintiff, who is 5'1" tall, weighed 140 pounds, and is hearing impaired, was placed in protective custody to

---

[14] A panel of the Tenth Circuit similarly held in an unpublished opinion authored by Circuit Judge Kelly:

> Mr. Lee Traylor, an inmate appearing *pro se* in this 42 U.S.C. § 1983 action, appeals from a grant of summary judgment in favor of Defendants. The district court adopted, over Mr. Traylor's objection, the magistrate judge's report and recommendation. On appeal, Mr. Traylor contends that he has been denied a liberty interest without due process and equal protection based upon classification changes culminating in his transfer to the Oklahoma State Penitentiary where he was placed in protective custody in a single cell. The summary judgment record indicates that prison officials moved Mr. Traylor based upon safety concerns of other inmates. Despite Mr. Traylor's characterization of the transfer as 'summary punishment,' his due process claim is barred by *Sandin v. Conner,* 515 U.S. 472 (1995). The confinement alleged does not implicate a protected liberty interest. *See id.* at 486. Mr. Traylor's equal protection challenge is likewise without merit-- Defendants established that any disparate treatment is rationally related to a legitimate governmental purpose. *See Riddle v. Mondragon,* 83 F.3d 1197, 1207 (10th Cir.1996).

*Traylor v. Cypert,* 172 F.3d 879 (10th Cir. 1999) (unpublished), *cert. denied,* 527 U.S. 1042 (1999).

ensure his safety. Furthermore, his request to be moved during his second incarceration was granted. *Plaintiff Depo*. at 25-76. Therefore, Plaintiff also fails to raise a constitutional claim concerning his placement in protective custody.

Although Plaintiff's ADA and Rehabilitation Act briefs use the word "equal" frequently, he is not raising, nor could he, a constitutional claim under the Equal Protection Clause. The Tenth Circuit stated that "[a]pathetic attitudes and refusals to make accommodations do not usually violate the Fourteenth Amendment." *Thompson v. Colorado,* 278 F.3d 1020 (10th Cir. 2001). The court further reasoned that "Title II's accommodation requirement appears to be an attempt to prescribe a new federal standard for the treatment of the disabled rather than an attempt to combat unconstitutional discrimination." *Id.* at 1034; *see also Bonner,* 857 F.2d at 565 (granting summary judgment in favor of defendants on claim that failure to provide an interpreter does not violate Equal Protection because cost is a reasonable justification under the rational basis test); *Spurlock,* 88 F. Supp. 2d at 1194 (restrictions placed on deaf inmate's use of TDD compared with hearing inmates fails to state a claim because hearing inmates' unlimited access to telephones is not similarly situated to deaf inmate who has to use a TDD that doesn't work with the inmate phone system.).

The only remaining theory Plaintiff advances is that his conditions of confinement were unconstitutional. Again, he fails to allege a cognizable claim. To prevail on a conditions of confinement claim . . . an inmate must establish that (1) the condition complained of is sufficiently serious to implicate constitutional protection, and (2) prison officials acted with deliberate indifference to inmate health or safety. *Despain v. Uphoff,* 264 F. 3d 965, 971 (10th Cir. 2001) (internal quotations and citations omitted); see also; *Craig v. Eberly,* 164 F. 3d 490, 495 (10th Cir.

1998) (same; Eighth Amendment standards in pretrial detainee context).

Conditions prisoners face by virtue of their incarceration can be restrictive and even harsh without running afoul of the Eighth Amendment. *Rhodes v. Chapman,* 452 U. S. 337, 347 (1981); *see also e.g., Despain,* 264 F. 2d at 973 (quoting *Barney v. Pulspher,* 143 F. 3d 1299, 1331 (10th Cir. 1998), which in turn quotes *Rhodes*). The Constitution does not mandate comfortable prisons . . . and only those deprivations denying the minimal civilized measure of life's necessities . . . are sufficiently grave to form the basis of an Eight Amendment violation. *Wilson v. Seiter,* 501 U. S. 294, 298 (1991) (quoting *Rhodes,* 452 U. S. at 347, 349); *see also Moore v. Prison Health Servs., Inc.,* 1999 WL 1079848 (10th Cir. 1999).

Life's necessities are identifiable human needs such as food, clothing, shelter, medical care, sanitation and reasonable measures by prison officials to ensure inmate safety. *See Wilson,* 501 U.S. at 304-05 (cumulative overall conditions not actionable under Eighth Amendment when no specific deprivation of a single human need exists); *Despain*, 264 F. 3d at 974; *Shannon,* 257 F. 2d at 1168; *Craig,* 164 F. 3d at 495. Plaintiff's complaints do not implicate any of these areas. *See Bonner,* 857 F.2d at 565-66 (failure to provide interpreter did not violate Eighth Amendment because that constitutional duty extends to things like "adequate food, clothing, shelter, sanitation, medical care, and personal safety.").

Because none of Plaintiff's theories are based on cognizable constitutional violations, there can be no municipal liability. *E.g., Trigalet v. City of Tulsa, Oklahoma,* 239 F.3d 1150, 1156 (10th Cir.), *cert. denied,* 122 S. Ct. 40 (2001).

### B. Municipal Liability Is Predicated On Respondeat Superior And Failure To Adopt Policy In Light Of ADA And Rehabilitation Act

There are two additional reasons why Plaintiff's § 1983 municipal liability claims fail. Foremost, although *respondeat superior* cannot be the basis of recovery, that is precisely the theory upon which Plaintiff seeks to recover. "Swearingen, together with the other Defendants, was responsible for ensuring that Mr. Romero was treated in a non-discriminatory manner [and he] failed to do so." *Doc. 83,* at 16. Aside from the lack of cognizable constitutional claims, this basis alone is sufficient to grant summary judgment.

Furthermore, as for the offending county policy, Plaintiff's arguments are inextricably linked to his ADA and Rehabilitation Act theories of recovery. There is no dispute that CCDC's written policies prohibit discrimination of all sorts, including discrimination on the basis of handicap.[15] Despite these written policies, Plaintiff's contends that by failing to conduct the review and modification required at least by the early 1990's under the ADA and Rehabilitation Act regulations discussed above, the county does not have a policy specifically addressing "reasonable accommodations" for deaf inmates. The lack of a specific policy, Plaintiff argues, is also accompanied by a failure to train in those specific areas. *See Doc. 83,* at 13-14, 16.

Several analytical problems arise with this argument. First, neither the county nor CCDC have a written policy to deny deaf inmates interpreters and TDD's. "Locating a 'policy' ensures

---

[15] CCDC's code of professional conduct for its employees requires "an attitude of respect for and protection of inmate's rights;" that employees treat inmates "humanely and protecting against violation of their rights," and that employees "not discriminate against any individual because of race, gender, creed, national origin, religious affiliation, age or any other type of prohibited discrimination." Policy & Procedures, §§ B-160(II)(A)(6), (14); B-210(I)(A). The inmate nondiscrimination section provides that CCDC "shall provide" the inmates "freedom from discrimination based on . . . handicap" and "[e]qual access to various programs and work assignments and involvement in decisions concerning classification status." *Id.,* § I-140.

that a municipality is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality." *Board of County Comm'rs of Bryan County, Okl. v. Brown,* 520 U.S. 397, 403-04 (1997). "It is not enough, however, that the plaintiff identify conduct properly attributable to the municipality." *Trigalet,* 239 F.3d at 1154 (internal quotations and citations omitted).

True, "an unconstitutional policy or custom need not be formal or written to create municipal liability," to be held liable. Yet Plaintiff must show that the "illegal practice is so permanent and well settled as to constitute a 'custom or usage' with the force of law." *Camfield v. City of Oklahoma City,* 248 F.3d 1214, 1229 (10th Cir. 2001) (internal quotations and citations omitted). No such showing or argument is made here.

Finally, Plaintiff's "lack of policy" and "failure to train" theories simply recast his ADA and Rehabilitation Act claims in § 1983 terminology, thereby making federal law rather than the federal constitution, the origin of the right of which he was allegedly deprived. Although the Tenth Circuit has not yet addressed the issue, four courts of appeals have held that because of the comprehensive remedial schemes offered by the ADA and Rehabilitation Act, a plaintiff cannot base a § 1983 claim solely on a violation of those federal laws. *See Vinson v. Thomas,* 288 F.3d 1145, 1156 (9th Cir. 2002) (citing *Alsbrook v. City of Maumelle,* 184 F.3d 999 (8th Cir. 1999) (en banc), *cert dismissed* 529 U.S. 1001 (2000), and *Lollar v. Baker,* 196 F.3d 603 (5th Cir. 1999), *petition for cert. filed,* 71 U.S.L.W. 3021 (6/20/02)); *see also Holbrook v. City of Alpharetta,* 112 F.3d 1522, 1531 (11th Cir. 1997).[16] Accordingly, for this additional reason Defendants are

---

[16] The Honorable Martha Vázquez reached a different conclusion in *Keller v. Board of Educ. of City of Albuquerque,* and relied on decisions from district courts in New York and Illinois. 182 F. Supp. 2d 1148, 1160 (D.N.M. 2001). Under the circumstances in this case, where the ADA and Rehabilitation

entitled to summary judgment on Plaintiff's municipal liability claims.

## V. Damages Claims

Plaintiff's Amended Complaint seeks $500,000 for each of his three counts, to compensate

him for "severe emotional distress, lost earnings and future earnings potential, [infringement on]

his liberties . . . humiliation and embarrassment, and . . . a default judgment being taken against

him in a divorce action." *Doc. 39, ¶¶ 32, 40 & 52.* Although Plaintiff sought punitive damages,

he now concedes that punitive damages are not available under the ADA/Rehabilitation Act in

light of *Barnes v. Gorman,* 122 S. Ct. 2097 (2002). *Doc. 65-1; see also Doc. 71* at 7-8.[17]

Defendants have moved for summary judgment on all of Plaintiff's compensatory damages

on the ground that there is no evidence of discriminatory intent to exclude him from services or

evidence of deliberate indifference. *See Doc. 71* at 9-13. In a separate motion, they move for

---

Act claims are simply recast in § 1983 terminology, however, I believe the better view is the position taken by the circuit courts as explained by the Eleventh Circuit in *Holbrook:*

> both the Rehabilitation Act and the ADA provide extensive, comprehensive remedial frameworks that address every aspect of [a plaintiff's claim] under section 1983. To permit a plaintiff to sue both under the substantive statutes that set forth detailed administrative avenue of redress as well as section 1983 would be duplicative at best; in effect such a holding would provide the plaintiff with two bites at precisely the same apple. We conclude that a plaintiff may not maintain a section 1983 action in lieu of--or in addition to--a Rehabilitation Act or ADA cause of action if the only alleged deprivation is of the employee's rights created by the Rehabilitation Act and the ADA.

112 F.3d at 1531.

[17] Citing *City of Newport v. Fact Concerns, Inc.,* 453 U.S. 247, 271 (1981); *Vinyard v. King,* 728 F.2d 428, 433 (10th Cir. 1984), Defendants argue that punitive damages are not recoverable against municipalities (or individuals in their official capacities) under § 1983. *Doc. 71* at 9. Plaintiff failed to address this argument in his memorandum. Because I have decided to grant summary judgment for Defendants on all § 1983 claims, I need not address this issue further.

summary judgment on his specific claims of lost earnings and damages related to his divorce. *See Doc. 80.*

### A. Lost Earnings

Defendants argue because Plaintiff was lawfully incarcerated, he cannot claim lost earnings for the time he was in jail. Plaintiff explains he is not claiming lost wages for the duration of his incarcerations. Plaintiff is claiming lost earnings as a result of his emotional distress, and Defendants have not separately moved for summary judgment based on this clarification. Accordingly, the motion is denied. *Doc. 72; see also Doc. 73* at 4; *Doc. 94.*

### B. Divorce Damages

Plaintiff claims that had Defendants provided an interpreter and TDD when he was incarcerated for the second time on July 14, 1998, he "would have been able to consult with an attorney, learn that a petition had been filed, answer the divorce petition, and otherwise have had an opportunity to litigate the divorce." *Doc. 80* at 4; *see also id.* at 5. As a proximate result, he claims he would have been able to establish what he contributed to the marital assets and recovered them, specifically at "trust account." *See id.* at 5-7. However, I agree with Defendants there is no evidence that a trust fund was ever established and what Plaintiff would have secured in a divorce is entirely speculative and unrecoverable.

### C. Compensatory Damages – Intent/Deliberate Indifference

Title II, by incorporation of the remedies under the Rehabilitation Act, requires proof of intentional discrimination to recover compensatory damages. *Baldonado v. New Mexico State Highway & Transp. Dept.,* CIV 99-366 JC/LCS (*Doc. 101* at 10; citing *Ferguson v. City of Phoenix,* 157 F.3d 668, 673 (10th Cir. 1998), *cert. denied,* 526 U.S. 1159 (1999), and *Tyler v.*

*City of Manhattan,* 849 F. Supp. 1442, 1444 (D. Kan. 1994), *aff'd on other grounds,* 118 F.3d

1400 (10th Cir. 1997)); *Matthew,* 29 F. Supp. 2d at 535 (collecting cases). Although I agree with

Defendants that on the present state of the record there is little, if any, evidence to support a

finding of intent, I reserve final decision on this issue following trial.

Wherefore,

**IT IS HEREBY ORDERED AS FOLLOWS:**

1.  Plaintiff's motions for summary judgment *(Docs. 84, 87)* and to strike *(see Docs. 105, 106)* are DENIED;

2.  Defendants' motions in limine *(Docs. 66, 68)* are GRANTED;

3.  Defendants' motion to strike Plaintiff's claims for punitive damages *(Doc. 65-1)* is GRANTED;

4.  Defendants' motion for summary judgment on certain damages *(Doc. 72)* is GRANTED as to his "divorce/trust account damages" and DENIED as to lost earnings damages as clarified;

5.  Defendants' motion for summary judgment *(Doc. 65-2)* is GRANTED as to Plaintiff's § 1983 claims and RESERVED as to Plaintiff's compensatory damages under the ADA and Rehabilitation Act. Accordingly, Count III of Plaintiff's Amended Complaint *(Doc. 39)* is DISMISSED; and

6.  This matter will proceed to a bench trial as previously scheduled solely on Plaintiff's ADA and Rehabilitation Act claims as set forth herein.

_____
UNITED STATES MAGISTRATE JUDGE
Presiding by consent